UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>                    Plaintiff,<br><br>v.<br><br>JOSHUA KENNETH DURR,<br><br>                    Defendant. | Case No. CR 18-096-S-EJL<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Pending before the Court in the above-entitled matter is Defendant Joshua Kenneth Durr's Motion to Suppress. (Dkt. 39.) The parties fully briefed the matter and the Court held an evidentiary hearing on August 2, 2018. (Dkt. 57). On August 13, 2018, the Official Transcript was lodged (Dkt. 58) and the parties filed their closing arguments on August 24, 2018. (Dkts. 64, 65.) The Motion is now ripe for decision. As described more fully below, the Court denies Mr. Durr's Motion.

## FINDINGS OF FACT

1.    **The Record**

Mr. Durr submitted the following exhibits in support of his Motion: (1) Exhibit A: Idaho State Police Felony Drug Case Report of January 20, 2018 Traffic Stop; (2) Exhibit B: Video of January 20, 2018 Traffic Stop; (3) Exhibit C: March 14, 2018 Application for Search Warrant with Affidavit; (4) Exhibit D: March 14, 2018 Search and Seizure Warrant;

(5) Exhibit E: Ada County Sherriff's Report Re Execution of March 14, 2018 Search Warrant; and (6) Exhibit F: Idaho Department of Correction Agreement of Supervision. These exhibits were admitted into evidence at the August 2, 2018 hearing. (Dkt. 57.) The Government also called two witnesses who testified at the hearing: (1) Idaho State Police Officer, Corporal Steve Otto, and (2) Drug Enforcement Administration ("DEA") Task Force Officer, Sergeant Kevin Louwsma. (*Id.*)

## 2. Factual Findings

### A. The Investigation into Mr. Durr in Boise before January 20, 2018

Sergeant Louwsma testified at the hearing largely consistent with the Affidavit he submitted in support of the March 14, 2018 Application for Search Warrant (Dkt. 41, Ex. C). (Dkt. 58, 49:18- 94:9.) Beginning in August of 2017, the DEA, Ada County Sheriff's Office, and Meridian Police Department began investigating an organization distributing methamphetamine and heroin from Mexico to the Las Vegas area and California for eventual distribution in the Boise and Nampa, Idaho areas. (Dkt. 41, Ex. C, ¶¶ 5, 6.) Through this investigation, law enforcement learned that this organization included Johnny Moreno, Candelaria Sanchez, and Uilese Tolai in Las Vegas, Nevada as well as Mr. Durr and Fausto Mascarro in Boise and Nampa, Idaho. (*Id.* at ¶6.)

Law enforcement had an undercover officer talking to Moreno, the source of supply. (Dkt. 58, 50:24-51:5.) As part of this investigation, in October 2017, law enforcement began looking at Johnny Moreno's phone records, which showed that Johnny Moreno was communicating with a phone number associated with Mr. Durr. (*Id.* at 51:6-52:15; Dkt. 41, Ex. C, ¶ 9.)

**MEMORANDUM DECISION AND ORDER- 2**

Law enforcement identified Mr. Durr by entering his phone number in the social networking site Facebook in October 2017. (*Id.*) Law enforcement then confirmed with a cooperating witness that Mr. Durr was involved with the Johnny Moreno organization. (Dkt. 58, 54:16-25.) At that point, law enforcement located an address for Mr. Durr, 4516 Alamosa St. in Boise, Idaho and also identified his vehicle. (*Id.* at ¶ 9.)

On November 7, 2018, law enforcement entered Mr. Durr's name and address into the Rocky Mountain Information Network, a conflicts database. (Dkt. 58, 55:7-56:12.) In addition, law enforcement conducted surveillance on Mr. Durr's house throughout November and December 2017. (*Id.*; 56:13-23; Dkt. 41, Ex. C, ¶ 9.)

Also as part of this on-going investigation, an undercover officer negotiated a one-pound methamphetamine purchase from Johnny Moreno that was completed on January 10, 2018 when Moreno traveled to Boise to deliver the drugs. (Dkt. 58, 57:2-16.) Law enforcement believed that Mr. Moreno was delivering to more than one location at that time. (*Id.* at 58:3-6.) During the January 10, 2018 arranged purchase, law enforcement attempted to follow Mr. Moreno in Boise, lost him, and drove by Mr. Durr's house in an effort to locate him. (*Id.* at 84:5-15.) Moreno was not there. *Id.*

### B.     *The January 20, 2018 Traffic Stop in Twin Falls*

Corporal Otto testified at the hearing largely consistent with his police report (Dkt. 41, Ex. A) and what can be seen in the video of the traffic stop (Dkt. 41, Ex. B). (Dkt. 58, 4:1-49:16.) He testified that at 1:15 a.m. on January 20, 2018, he was traveling north on U.S. 93 when he observed a black passenger car, a 2010 Jaguar, traveling southbound. (*Id.*

at 5:15-18.) Corporal Otto activated his radar and determined the car was traveling 54 miles an hour in an area with a posted speed limit of 45 miles an hour. (*Id.* at 5:18-21.)

Corporal Otto stopped the car on Highway 93 near mile post 48 in Twin Falls, Idaho. (Dkt. 41, Ex. A, pp. 3, 9.) It is undisputed that: (1) the driver, Kelly Dean, was speeding; (2) Mr. Durr was her passenger; and (3) the car was registered to Mr. Durr.

Corporal Otto asked the driver where she was headed and Ms. Dean told him they were headed to Jackpot. (*Id.* at p. 9.) Corporal Otto noted that the driver and passenger appeared very nervous. (*Id.*)

Corporal Otto obtained Ms. Dean's driver's license, current vehicle registration, and proof of insurance. *Id.* He also obtained Mr. Durr's driver's license because the car was registered to him. *Id.* Corporal Otto returned to his car to run both drivers' licenses through dispatch. (*Id.*). As a result, Corporal Otto discovered that Ms. Dean was on felony drug probation. (*Id.*)

Corporal Otto suspected that traveling across the state line would be a violation of Ms. Dean's terms of supervision and, at that point, shifted gears. Rather than investigating the traffic stop, he began investigating Ms. Dean for other potential criminal violations including suspected drug activity and additional probation violations.

Before returning to Mr. Durr's vehicle, Corporal Otto called a canine officer reflecting his investigation into suspected drug activity. Corporal Otto relied upon six facts to support his suspicion of drug activity. First, U.S. 93 is a known drug corridor. Second, it was 1:15 a.m. Third, Ms. Dean and Mr. Durr appeared very nervous. Ms. Dean spoke softly, whispering and mumbling, and Mr. Durr was pressed back in his seat, stiff and rigid.

**MEMORANDUM DECISION AND ORDER- 4**

Neither would make eye contact with him. Fourth, Corporal Otto found their travel plans suspicious. Fifth, there was a knife in the center console of the vehicle. Sixth, Ms. Dean was not forthcoming about her probation status when initially detained.

Upon returning to Mr. Durr's vehicle, Corporal Otto began questioning Ms. Dean about her probation status reflecting his investigation into Ms. Dean's possible probation violations. Corporal Otto relied upon the following three facts to support his investigation into Ms. Dean's suspected probation violations. First, Ms. Dean failed to identify that she was on felony supervision. Corporal Otto believed individuals under IDOC supervision who are detained must inform law enforcement of their felony supervision. This potential violation had already occurred and Corporal Otto also considered it a sign of deception. (Dkt. 58, 11:18-22.) Second, Ms. Dean had a knife in the console of her vehicle. Corporal Otto believed that individuals under IDOC supervision are not allowed to have weapons. (*Id.* at 13:20-22.) Third, Ms. Dean was traveling through Twin Falls, Idaho and had intended to travel to Jackpot, Nevada. Corporal Otto believed individuals under IDOC custody are not permitted to leave the state or their assigned district without the consent of their probation officers. (*Id.* at 12:13-13:19.)

When questioned, Ms. Dean admitted that she was not permitted to leave the state. She also provided Corporal Otto with her probation officer's name, Scott Wasco out of District Three, but did not have his phone number. (Dkt. 41, Ex. A, ¶ 6.) This contributed to Corporal Otto's suspicions of both potential drug activity and probation violations, because Corporal Otto believed that individuals on felony drug supervision would be in frequent contact with their probation officer's and, for that reason, should have their

probation officer's number available upon request. *Id.* In addition, Twin Falls is not in District Three; thus, this third potential violation was on-going. However, there is nothing in the record to indicate that Corporal Otto asked, or Ms. Dean answered, whether she was permitted to be outside District Three.

Corporal Otto can be heard on the video telling Ms. Dean not to worry; she had not violated her probation yet. (*Id.* at 16:18-20.) However, Corporal Otto testified that he said this, not because it was true, but because he wanted to deescalate the situation. *Id.*

Upon returning to his vehicle, Corporal Otto tried to find the probation officer's phone number through a Google search. He also called dispatch for a criminal background check on Mr. Durr. Corporal Otto is aware that probationers are typically not allowed to associate with felons, and he wanted to investigate this possible "add-on" violation. (Dkt. 58, 19:18-22.) In addition, Corporal Otto apparently intended to call Ms. Dean's probation officer to see if the probation officer wanted her detained for the probation violations. (*Id.* at 17:4-6.) He also wanted to investigate the scope of the violations at issue.

The canine officer arrived before dispatch returned with information regarding Mr. Durr's criminal background check. Once the canine officer arrived, he ran the drug detection canine around the vehicle and it alerted to the odor of narcotics. (Dkt. 41, Ex. C., ¶ 9.) A subsequent search of the vehicle yielded: (1) over $25,000 in American currency; (2) four cellular phones; (3) suspected cocaine; (4) suspected Oxycodone; (5) suspected Tramadol; and (6) several items of paraphernalia, some of which tested presumptive positive for methamphetamine. (*Id.*)

Shortly thereafter, Idaho State Police were granted a search warrant on the cellular phones. (*Id.* at ¶ 10.) The record reflects only that information obtained from one of the telephones, believed to be Mr. Durr's, which contained several recovered text messages. (*Id.* at ¶ 11.) Law enforcement believed these text messages confirmed Mr. Durr's association with Johnny Moreno and specifically that Mr. Durr intended to purchase ten pounds of methamphetamine from him. (*Id.*)

Sergeant Louwsma learned about the traffic stop a day or two after it occurred. (Dkt. 58, 58:10-59-5.) Sergeant Louwsma testified that the recovered text messages confirmed what he already believed regarding Mr. Durr's involvement with the Johnny Moreno distribution network in the Boise area. (*Id.* at 80:6-10.)

### C. The Investigation into Mr. Durr in Boise after January 20, 2018.

The Boise investigation into Johnny Moreno was on-going and continued after the January 20, 2018 traffic stop in Twin Falls. As part of that investigation, on February 16, 2018, United States District Judge B. Lynn Winmill signed a court order for a wire and electronic communications intercept on a telephone number belonging to Johnny Moreno. (Dkt. 41, Ex. C, ¶ 8.) The wire and electronics intercept was activated four days later. *Id.* Based on information from the wire and electronics intercept, law enforcement learned about three separate shipments of drugs to the Boise area.

First, drug enforcement learned that Mr. Moreno was sending some people into the Boise area with a shipment of drugs on February 22, 2018. (Dkt. 58, 59:3-25, 85:20-22.) Also based on these intercepted phone calls, law enforcement set up surveillance at Mr. Durr's house. (*Id.* at 60:1-3.) As a result of this surveillance, law enforcement observed

two people, identified as Candelaria Sanchez and Uilese Tolai, in a two-toned Honda Element delivering what law enforcement believed to be ten pounds of methamphetamine to Mr. Durr's house. (*Id.* at 60:4-11.)

Second, based on information from the wire and electronics intercept, law enforcement learned of a second trip Ms. Sanchez planned to deliver methamphetamine to the Boise area on March 1, 2018. (*Id.* at 60:19-61:3.) Again, law enforcement set up surveillance but at three separate locations including Mr. Durr's house. (*Id.* at 60:3-7.) Ms. Sanchez's vehicle was identified in Marsing and followed to the Riverside Hotel in Garden City. (*Id.* at 61:8-21, 62:17-19.) At the same time, law enforcement was also monitoring the phone calls of Johnny Moreno and Candelaria Sanchez and, based on those communications, believed Mr. Durr was purchasing large quantities of methamphetamine at the Riverside Hotel. (*Id.* at 61:22-24.) Law enforcement also observed Mr. Durr at the hotel with Ms. Sanchez and others. (*Id.* at 62:21-63:7.)

Third, based on information from the wire and electronics intercept, law enforcement learned of a third trip Ms. Sanchez planned to deliver methamphetamine to the Boise area on March 7, 2018. (*Id.* at 63:22-25.) Again, law enforcement set up surveillance at three separate locations including Mr. Durr's house. (*Id.* at 64:1-6.) Again, Ms. Sanchez's vehicle was identified on her way into Boise- this time in Mountain Home, Idaho. (*Id.* at 64:7-11.) Ms. Sanchez was followed to Mr. Durr's residence. (*Id.* at 64:13-16.) Law enforcement monitored a phone call from Ms. Sanchez to Johnny Moreno while she was at Mr. Durr's house, and she indicated that they were counting the money. (*Id.* at 64:18-24.)

**MEMORANDUM DECISION AND ORDER- 8**

Based on these three prior, suspected drug transactions, law enforcement applied for a search warrant at Mr. Durr's residence to intercept what they believed would be a fourth delivery of methamphetamine. The March 14, 2018 application for search warrant includes information gained from the Boise investigation into Mr. Moreno as well as information gleaned from the Twin Falls traffic stop. United States Magistrate Judge Ronald E. Bush signed the warrant and it was executed on March 18, 2018.

## ANALYSIS

Mr. Durr seeks to suppress: (1) all evidence obtained at the January 20, 2018 traffic stop and (2) all additional evidence obtained through subsequent surveillance of Mr. Durr and the March 14, 2018 search warrant executed on Mr. Durr's house. Mr. Durr argues that the traffic stop violated his Fourth Amendment rights and the subsequent surveillance and warrant were derivative of that stop and, thus, constitute "fruit of the poisonous tree."

It is undisputed that: (1) there was an investigation into Mr. Durr's participation in drug trafficking before and independent of the January 20, 2018 traffic stop; (2) there was reasonable suspicion to support the initial traffic stop; and (3) the traffic stop was prolonged beyond the scope of the traffic investigation to investigate other suspected criminal activity. The disputes are: (1) whether law enforcement had independent reasonable suspicion of criminal activity necessary to prolong the January 20, 2018 traffic stop through the time the dog sniff occurred and, if not, (2) whether law enforcement had an independent factual basis to support the March 14, 2018 search warrant. The Court find the Government has met its burden on both issues.

1. **Prolongation of the Traffic Stop Detention Was Supported by Independent Reasonable Suspicion of an On-Going Probation Violation.**

The traffic stop was not unconstitutionally prolonged to accommodate the drug sniff. Rather, the purpose of the traffic stop was abandoned as soon as law enforcement learned that Ms. Dean was on felony drug probation. The Court finds that Corporal Otto had a reasonable suspicion that Ms. Dean was in violation of her terms of probation and was investigating the scope of those violations when the canine officer arrived.

A traffic stop is a seizure within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648 (1979). The Fourth Amendment requires that law enforcement have a reasonable suspicion that a driver has violated a traffic law in order to conduct an investigative traffic stop. *United States v. Lopez-Soto*, 205 F.3d 1101, 1104-05 (9th Cir. 2000). Reasonable suspicion is found when "specific, articulable facts, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *Id.* at 1105 (internal quotation omitted).

A seizure justified by the reasonable suspicion of a traffic violation generally includes a reasonable investigation into that traffic violation. *Rodriguez v. U.S.*, 135 S.Ct. 1609, 1612 (2015). "[A] routine traffic stop is more analogous to a so-called *Terry* stop than to a formal arrest." *Id.* at 1614 (internal quotations omitted). "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'- to address the traffic violations that warranted the stop . . . and attend to related safety concerns." *Id.* (internal citations omitted).

Typically, a traffic stop involves "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 1615. Such tasks are reasonable in scope, because they are tied to enforcement of the traffic code.

Therefore, "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are – or reasonably should have been- completed." *Id.* at 1614. "[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Id.* at 1612, 1614.

"[A] dog sniff . . . is not an ordinary incident of a traffic stop." *Id.* It is not logically connected to the traffic stop but "is a measure aimed at detect[ing] evidence of ordinary criminal wrongdoing." *Id.* Accordingly, if the dog sniff prolongs the traffic stop, it is unconstitutional unless there is an independent, reasonable suspicion of criminal activity necessary to prolong the stop. *Id.; see also Berkemer v. McCarty*, 468 U.S. 420, 437 (1984) (traffic stops are "presumptively temporary and brief"); *United States v. Gorman*, 859 F.3d 706, 714 (9th Cir. 2017) ("traffic stops can last only as long as is reasonably necessary to carry out the mission of the stop, unless police have an independent reason to detain the motorist longer")(quotations omitted).

In this case, upon learning that Ms. Dean was on probation, Corporal Otto essentially abandoned the speeding ticket and began investigating other activity. (*Id.* at 48:17-23.) This included both suspected criminal drug activity as well as a contemporaneous investigation into the scope of Ms. Dean's suspected probation

violations. The issue is whether either of these investigations was based on independent reasonable suspicion.

It is not clear from the record that the facts could support a finding of independent reasonable suspicion of criminal drug activity necessary to prolong the stop exclusively for the purpose of allowing time for a dog sniff. However, the Court finds the facts clearly support a finding that Corporal Otto had reasonable suspicion of Ms. Dean's attempted and possibly on-going probation violations and was actively investigating those when the canine officer arrived.

In determining whether an officer was justified in prolonging a stop to allow for an investigation into other criminal activity, courts look to whether "the officer's testimony concerning the relevant facts [is] credible" and whether those facts objectively create reasonable, particularized suspicion that a person is engaged in criminal activity. *United States v. Evans*, 786 F.3d 779, 788-89 (9th Cir. 2015). "The requirement of particularized suspicion encompasses two elements. First, the assessment must be based upon the totality of the circumstances. Second, that assessment must arouse a reasonable suspicion that the particular person being stopped has committed or is about to commit a crime." *United States v. Montero-Carmago*, 208 F.3d 1122, 1129 (9th Cir. 2000) (internal citations omitted).

In this case, the totality of the circumstances support Corporal Otto's decision to prolong the stop- or continue to detain Ms. Dean- for the purpose of investigating Ms. Dean's potential probation violations. Some of these potential violations had already occurred and others were on-going and potentially needed to be addressed before Ms. Dean

was released from the temporary and brief investigative detention. The Court relies on the following four facts to support this finding.

First, Ms. Dean failed to identify that she was on felony supervision. Corporal Otto understood that individuals under IDOC supervision are typically required to obey all municipal, county, state, and federal laws and, if detained, must inform law enforcement of their felony supervision. (Dkt. 58, 11:18-22; Dkt. 41, Ex. F, ¶ 1.) This potential violation had already occurred and Corporal Otto considered it a sign of deception. *Id.*

Second, Ms. Dean had a knife in the console of her vehicle. Corporal Otto understood that individuals under IDOC supervision are typically not allowed to have weapons. (Dkt. 58, 13:20-22; Dkt. 41, Ex. F, ¶ 4.) This potential violation had also already occurred.

Third, Ms. Dean admitted that she did not have permission to leave the state in which she was being supervised. Corporal Otto understood that individuals under IDOC custody are not permitted to leave the state- or their assigned district- without the consent of her probation officer. (Dkt. 58, 12:13-13:19.; Dkt. 41, Ex. F, ¶ 8.) This third potential violation was on-going if Ms. Dean did not have permission to leave District Three.

Fourth, Corporal Otto was awaiting the results of a criminal background check on Mr. Durr when the canine officer arrived. Corporal Otto understood that individuals on probation typically cannot associate with convicted felons. (Dkt. 58, 13:20-22; Dkt. 41, Ex. F, ¶ 7.) This fourth potential violation was also on-going and, under the circumstances, it was reasonable for Corporal Otto to wait for dispatch to report back to him with

information regarding Mr. Durr's status as a felon before deciding on a further course of action.

Moreover, contrary to Mr. Durr's arguments, being caught driving over the speed limit on the way to Jackpot, Nevada at 1:15 a.m. does not represent a simple, technical probation violation already thwarted by police that would justify letting Ms. Dean go without further investigation. Rather, the destination alone- a well-known location for gambling, drinking, and drugs- raises serious concerns regarding Ms. Dean's on-going compliance with her felony probation, which she admitted resulted from a drug charge. Further, as Corporal Otto indicated, Ms. Dean did not have her probation officer's number. Though not a technical violation of probation, this raised additional concerns regarding whether Ms. Dean: (1) truly did not have the number or was trying to avoid contacting the probation officer and (2) was otherwise out of touch with her probation officer and thus completely out of compliance with her supervision. Felony drug probation is serious and, as Corporal Otto noted, individuals on supervision usually have their probation officers phone numbers so that they can be in frequent contact and ensure on-going compliance with the terms of their supervision.

Under these circumstances, it was entirely appropriate for Corporal Otto to delay the stop for a reasonable time to complete a background check on Mr. Durr. It was also appropriate to delay the stop for a reasonable amount of time to allow Corporal Otto to problem solve regarding how he would reach Ms. Dean's probation officer or an on-call number for the probation department after 1:00 a.m. Put another way, it would be unreasonable not to prolong the stop to conduct these reasonable investigative steps before

sending Ms. Dean and Mr. Durr on their way- albeit necessarily in the opposite direction from where they had been headed.

At the same time, the Court notes that Mr. Durr's concerns are not unfounded. The video shows that Corporal Otto called a drug canine immediately upon learning that Ms. Dean was on probation. On the video, he also suggested that he was prolonging the stop until a canine unit could arrive.

Law enforcement may not prolong the stop indefinitely based on Ms. Dean's probationary status or prolong a traffic stop to allow time for a drug sniff based on her probationary status alone. *See United States v. Knights*, 534 U.S. 112, 121 (2001) (holding warrantless search of probationer's apartment "requires no more than reasonable suspicion"). Felony probationers have reduced protections under the Fourth Amendment and a diminished expectation of privacy but they are not wholly without Fourth Amendment protections and privacy rights. *Id.*

Nevertheless, under the circumstances here, the Court finds the investigation Corporal Otto was conducting at the time of the canine officer's arrival was based on a reasonable suspicion of possibly on-going probation violations. Further, the scope of the attendant investigative delay was not unreasonable under the circumstances.

In short, the Court finds that it was appropriate for Corporal Otto to prolong the detention for a reasonable period of time to first determine whether Ms. Dean was associating with a felon and, if so, then try to contact Ms. Dean's probation officer or someone else in probation to report that Ms. Dean had been stopped in Twin Falls on her way to Jackpot, Nevada with a known felon and see what they wanted him to do. (Dkt. 58,

**MEMORANDUM DECISION AND ORDER- 15**

19:16-25.) Because that investigation was on-going when the canine arrived, the canine sniff itself and alone did not prolong the detention. In short, the Court does not find that the January 20, 2018 traffic stop in Twin Falls violated Ms. Dean's or Mr. Durr's Fourth Amendment rights.

2.    **Even if the Traffic Stop Had Been Unreasonably Prolonged, the Exclusionary Rule Does Not Apply to the Facts of this Case.**

Mr. Durr argues that the search warrant's probable cause determination is based solely on information obtained through physical surveillance of Mr. Durr's residence and that surveillance would not have occurred but for the information gained about Mr. Durr during the January 20, 2018 traffic stop in Twin Falls. The Court disagrees. Both the independent source doctrine and inevitable discovery rule apply to the facts of this case.

The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search. *Weeks v. United States*, 232 U.S. 383 (1914). It also prohibits testimony concerning knowledge acquired during an unlawful search. *Silverman v. United States*, 365 U.S. 505 (1961). The scope of the exclusionary rule includes both "primary evidence obtained as a direct result of an illegal search or seizure" as well as "evidence later discovered and found to be derivative of an illegality," the "fruit of the poisonous tree." *Segura v. United States*, 468 U.S. 796, 804 (1984).

There are three exceptions to the exclusionary rule that "involve the causal relationship between the unconstitutional act and the discovery of evidence." *Utah v. Strieff*, 136 S. Ct. 2056, 2061, 195 L. Ed. 2d 400 (2016). The Supreme Court describes these exceptions as follows:

First, the independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source. See *Murray v. United States,* 487 U.S. 533, 537 (1988). Second, the inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source. See *Nix v. Williams,* 467 U.S. 431, 443–444 (1984). Third . . . is the attenuation doctrine: Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that "the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).

*Id.*

Under the circumstances presented in this case, the Court finds that the exclusionary rule would not apply, because: (1) the vast weight of the investigative materials gathered in support of the March 14, 2018 warrant came from independent sources and (2) Mr. Durr's involvement in the alleged Moreno drug conspiracy at issue had been discovered before the traffic stop and it is more likely than not that the full scope of that involvement would have been discovered regardless of the information gleaned from the traffic stop.

### A. The Independent Source Doctrine

Mr. Durr seeks to suppress all evidence obtained through execution of the March 14, 2018 search warrant. However, the vast weight of the evidence in support of the search warrant is completely independent of, and untainted by, the traffic stop.

As a preliminary matter, the only relevant evidence gathered as a result of the traffic stop was the text messages. Law enforcement believed these text messages showed that

Mr. Durr was texting with Johnny Moreno and intended to purchase ten pounds of methamphetamine from him.

The record also reflects that there was an on-going investigation into Mr. Moreno and his known associates, including Mr. Durr, before the January 20, 2018 traffic stop. As part of this investigation, law enforcement had already identified Mr. Durr and his vehicle and was surveilling his house.

Further, as part of the on-going investigation into Johnny Moreno and his Idaho associates, law enforcement began intercepting Moreno's wire and electronic communications on February 20, 2018. These communications and related surveillance form the backbone of this investigation. From these communications, law enforcement learned of three separate deliveries from Moreno via Ms. Sanchez directly to Mr. Durr. Law enforcement was able to surveil these deliveries on February 22, 2018; March 1, 2018; and March 7, 2018 and corroborate what could be seen by reference to the on-going and contemporaneous wire and electronic intercepts.

Moreover, law enforcement surveillance picked up two of these deliveries by locating the load vehicle, a two-tone Honda Element driven by Candelaria Sanchez, outside of the Boise, Idaho area and following it directly to Mr. Durr. On March 1, 2017, the vehicle was located in Marsing, Idaho and led law enforcement to Mr. Durr at the Riverside Hotel and on March 7, 2018, the vehicle was located in Mountain Home and led law enforcement to Mr. Durr at his residence.

Mr. Durr argues that the two-tone Honda was identified for the first time during the February 22, 2018 surveillance of Mr. Durr's home and that surveillance would not have

occurred but for the January 20, 2018 traffic stop. (Dkts. 40, 64.) Sergeant Louwsma testified that law enforcement knew about the Honda Element before February 22, 2018. (Dkt. 58, 85:20-86:3.) However, when pressed on cross-examination, Sergeant Louwsma said he would have to look at his surveillance report to confirm that testimony. (*Id.* at 86:4-16.) The surveillance report is not in the record.

The Court has considered Mr. Durr's argument and ultimately finds it unpersuasive. Given law enforcement's interest in, and surveillance of, Mr. Durr before January 20, 2018, the Court finds it highly likely that law enforcement would have brought a surveillance team to Mr. Durr's residence on February 22, 2018 regardless of the information gained pursuant to the January 20, 2018 traffic stop.

First, in Sergeant Louwsma's affidavit provided in support of the March 14, 2018 Search Warrant, he states that he was aware of the two-tone Honda Element before the February 22, 2018 surveillance. Specifically, the affidavit states that on February 22, 2018 at 3:54 p.m., a two-tone Honda Element pulled into the parking lot in front of Mr. Durr's home and Sergeant Louwsma, who "had been made aware of the license plate and vehicle from previous surveillance . . . drove by the residence and confirmed the license plate." (Dkt. 41, Ex. C, ¶ 21.) This fact significantly undercuts defense's argument that the Honda Element was identified for the first time on February 22, 2018.

Second, Sergeant Louwsma testified that surveillance was set up at Mr. Durr's house on February 22, 2018 when law enforcement learned that a group of people was coming to deliver drugs to Mr. Durr that day. (Dkt. 58:59:17-60:3.) This same information was in his March 14, 2014 Affidavit. (Dkt. 41, Ex. C, ¶ 12.) This undercuts defense's

argument that the Honda Element was identified through random surveillance of Mr. Durr's home that was necessarily increased as a result of the January 20, 2018 traffic stop. Rather, the record reflects that law enforcement believed that the February 22, 2018 delivery was going to Mr. Durr and, for that reason, set up surveillance at his residence.

Third, on February 22, 2018, Ms. Sanchez indicated she was making a delivery to "Guero" or "Crazy." (Dkt. 41, Ex. C, ¶¶15-16.) There is no suggestion in the record that the names "Guero" or "Crazy" were part of the information received via the warrant on Mr. Durr's cell phone and obtained through the January 20, 2018 traffic stop. (Dkt. 41, Ex. C, ¶ 11.) Rather, law enforcement appears to have associated the names "Guero" and "Crazy" with Mr. Durr through independent means. (Dkt. 58, 82:10-83:12, 92:20-93:4.) Further, "Guero" is a common term used to refer to a white male and Mr. Durr was the only white male associate of Mr. Moreno's in the Boise area known to law enforcement. (*Id.* at 62:9-16; 92:23-93:7.) Associating Mr. Durr with the names "Guero" or "Crazy" also led law enforcement to Mr. Durr's residence on February 22, 2018 regardless of the January 20, 2018 traffic stop.

Fourth, on January 10, 2018, law enforcement was following Johnny Moreno during a controlled buy in Boise, Idaho. After losing Mr. Moreno, law enforcement drove by Mr. Durr's residence in an effort to find him. Law enforcement did not find Mr. Moreno there, but it is more likely than not that law enforcement would set up on-going surveillance at Mr. Durr's house when they learned of the next delivery of drugs to the Boise area.

In sum, the Court is satisfied that the independent source rule applies. Any evidence obtained from Mr. Durr's phone as a consequence of the January 20, 2018 traffic stop was later obtained independently from untainted law enforcement activities.

### B. The Inevitable Discovery Rule

The parties did not address this issue but the Court offers this alternative rationale for its decision.

The inevitable discovery rule applies if the Government can demonstrate by a preponderance of the evidence that the information sought to be suppressed "ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984.) "[T]he purpose of the inevitable discovery rule is to block setting aside convictions that would have been obtained absent police misconduct." *Id.* at 443.

Like the independent source doctrine, the inevitable discovery rule "ensures that the prosecution is not put in a worse position simply because of some earlier police misconduct." *Id.* at 443-444. The distinction is that the inevitable discovery rule "asks whether evidence *would have* been discovered by lawful means rather than by an illegal search," while "the independent source doctrine asks whether the evidence *actually* was obtained independently from activities untainted by the initial illegality." *United States v. Lundin*, 817 F.3d 1151, 1161 (9th Cir. 2016) (emphasis in original) (quotations omitted).

In this case, the Boise investigation into Johnny Moreno had identified Mr. Durr before the January 20, 2018 stop and the Court finds that it is more probable than not- even highly likely- that the Boise investigation would have continued to investigate Mr. Durr whether or not the January 20, 2018 traffic stop occurred.

The same facts that support the independent source rule also support the inevitable discovery rule. In addition, given the large quantities of drugs involved in the alleged Johnny Moreno conspiracy, the size and resources devoted to the investigation, and the large quantities of drugs Mr. Durr continued to purchase from Moreno after the traffic stop, the Court is finds by a preponderance of the evidence that the on-going investigation would have continued to lead investigators to Mr. Durr whether or not Mr. Durr was pulled over in Twin Falls, Idaho on January 20, 2018.

In short and in sum, the information gleaned from the independent traffic stop in Twin Falls pales in comparison to the other independent investigative efforts being made by the DEA, Ada County Sheriff's Office, and Meridian Police Department beginning in August 2017 to identify the associates and particulars of an organization distributing methamphetamine and heroin from Mexico to the Las Vegas area and California for eventual distribution in the Boise and Nampa, Idaho areas. As a result of these separate and independent efforts, law enforcement identified Johnny Moreno and Mr. Durr. Further, given the scope of the investigation described, both the independent source doctrine and inevitable discovery rule apply to this case and the exclusionary rule would not bar admission of evidence gained during surveillance of Mr. Durr after January 20, 2018 or through execution of the March 14, 2018 warrant.

## CONCLUSION

The Court finds that the traffic stop at issue did not violate the Fourth Amendment. Further, even if the traffic stop was deemed unconstitutional, the exclusionary rule would not apply to the evidence Mr. Durr seeks to exclude.

**MEMORANDUM DECISION AND ORDER- 22**

**ORDER**

NOW THEREFORE IT IS HEREBY ORDERED that Defendant's Motion to Suppress (Dkt. 39) is DENIED as stated herein.

DATED: September 13, 2018

Edward J. Lodge
United States District Judge